Deputy Attorney General Victoria Wilson for appellants. The California Court of Appeal considered and rejected petitioner's claims of prosecutorial misconduct, and this is the classic case requiring deference to the state court's adjudication. The state court's adjudication was not unreasonable and therefore just the type of decision that the AEDPA shields on habeas review. In opening statements and closing arguments, the prosecutor recounted Dr. Noor's life in Cambodia, including the death of his wife and child. The telling of Dr. Noor's story was not an appeal to the passions and prejudices of the jurors. Instead, it was relevant to the people's theory of the case, that Dr. Noor's extraordinary personal history would have made him resist petitioner's attempts to steal his locket. Why is that relevant? What evidence was there that he resisted? The evidence of resistance to steal a locket and stole a chain. The evidence of resistance is a reasonable inference from the evidence. We know that the locket had great sentimental value to Dr. Noor. We also know that petitioners had engaged in prior chain snatches in which there was no gunfire, and there was no evidence in the record that petitioners were ever concerned about eliminating witnesses. How many prior chain snatches have there been in the record? There were a few instances which several witnesses testified to. Donna Ikana, who was the girlfriend of Chan, testified to an incident where the three petitioners took a necklace or snatched a necklace from a girl in Chinatown. Timmy Tang talked about someone from whom the petitioners had taken a necklace. I also date the petitioners, at least two of them, Chan and Lim, had demanded the necklace from another witness named Heinma. So there were several witnesses who testified about the chain snatches. In addition, Talmay, another witness, talked about how petitioners talked about committing necklace snatches. So there were several witnesses, several sort of – from several sources. We know that petitioners engaged in prior chain snatches, but they had not previously fired a gun. And so the evidence of resistance, going back to the court's question – Were there any – was there any injury to his neck, any abrasions? To Mr. – to Dr. Knorr? Yes, to the doctor. There was no evidence presented in the record that there was any abrasion. There's no evidence in the record to that effect. But we do know that the necklace is a very long necklace, about 9 inches long, or 9 inches from the neck. So it came to the center of his chest. It's quite possible it could have been taken off without leaving any kind of abrasion. Why is it relevant that he would have – that he did resist? The evidence of resistance is important in this case, because evidence of resistance is evidence of motive for the murder. Every jury wants to know why a murder occurs. And here the prosecutor explained to the jurors that Dr. Knorr was killed because he resisted, and he resisted because of the unique sentimental value of the locket. Is resistance also relevant to show that the killing was in the commission of a robbery? Absolutely. Evidence of resistance bolstered the people's case that there was forced use and there was a robbery committed. So evidence of resistance was important to the people's case, and the evidence of resistance was a reasonable inference from the evidence. Let me ask you another question. Of course, this is a habeas case, which means we don't exercise our supervisory authority. So a lot of our federal cases really don't attach to this. It's a due process question. And the information that is being talked about, about his previous life, is something that I might believe would have been explored in voir dire. Do you know what the voir dire consisted of in terms of communicating the substance of this victim's life to the jurors and extracting a promise they would decide the case based on sympathy for him or anything like that?  I'm saying we don't have that. Oh, the transcript of the voir dire. There's an oblique footnote in one of the briefs saying, you know, we haven't given you the whole cake, but if you want it, we will. Yes. I'm not sure the extent of the voir dire in the transcript, if the entirety of it is in there. But certainly we know from the prosecutor's opening statement, which is a part of the excerpts now, the prosecutor says, well, the trial court talked to you about the fact that this man was an Academy Award winning actor. He was famous. I read that, you see, but that's what I really like you to do is file the entire voir dire, because as I said, if this is a due process question, you've got to look at the trial. The Supreme Court tells us as a whole. And if the question is whether there was inflammatory information, I'd like to see to what extent that inflammatory information got into voir dire, what was said, whether the defense asked that this be brought up and questions asked about. I just don't know. So I'd like to get those. We will supply those for the court again. Was that before the magistrate? Yes, it was before the magistrate. Yes. The entire trial record that we have on appeal was filed with the district court, the magistrate judge. And we just don't have it. Yes. Yeah, that's what I'm asking. It's in the district court. We just ordered it up. Yes. It's in the district court still? I don't know if they've held on to it or they send it back to the parties, but we'd be happy to file a supplemental, a second supplemental excerpt of records providing the court. I really think we're going to need the entire district, the trial court record from the state court. We will provide those to the court immediately. Putting aside the comments of the prosecutor, even assuming that they were improper, they did not render the trial in this case fundamentally unfair and there was no due process violation. The trial court instructed the three juries in this case three times that the statements of counsel were not evidence and not to be swayed by sympathy and passion. And as this court has recognized, arguments of counsel generally carry less weight with the jurors than do instructions from the trial court. Well, how do we recognize that? It's a legal rule that this court has stated that generally jurors are more influenced by the instructions of the trial court rather than by the arguments of counsel. It goes hand in hand probably with the trial court's instruction that jurors not be influenced by sympathy and passion. Do you have a case that says that? Yes, I do. Houston v. Rhodes, a Ninth Circuit case from 1999. Arguments of counsel generally carry less weight with the jury than do instructions from the court. And it's quoting Boyd v. California, U.S. Supreme Court case. So the citation with the clerk, we have gum sheets. Yes, it's in the brief on page 46. In addition, the evidentiary portion of this trial was five weeks long. The jurors were presented with numerous witness statements, testimony, and exhibits. Defending remarks of the prosecutor were a small part of a very lengthy trial. Finally, there was no due process violation because, as the state court found, this case was not close. The evidence of presence and flight connected Petitioners to the crimes. After the gunfire, Varick Starek, one of the key witnesses in this case, saw Petitioners 22 feet from Dr. Knorr's car. Both Starek and Krine saw Petitioners running away from the crime scene seconds after the gunfire. Was any gunpowder on the hands of any of the Petitioners? There's no evidence to that effect in the record. At what stage in the trial court was the objection raised to the argument of the prosecutor? There was an objection raised as to appealing to passions and prejudice, not arguing facts, not in evidence. And that objection was raised after the first opening argument given by the prosecutor. Was that an objection or was it a request to tell the prosecutor to cool it down? I haven't yet found it. I may have missed it. An objection? Your Honor, please tell the jury to disregard that. Motion for mistrial? All I see was a comment that this is getting overheated. Your Honor is correct. That is a more accurate description of the record. Did you see anybody say objection or asking for a motion to strike or anything like that? No. Your Honor has that record. When you say it's an objection, was it or wasn't it? I believe that constitutes an objection. There was no request, no curative admonition was requested, but they did request that. That might have made it worse. A curative admonition? Perhaps if it was litigated. I mean, it wasn't discussed. What was asked for? To ask the prosecutor to cool it down. And the trial court said, well, I find the court ruled that I find all of this relevant. So the court gave a ruling and said, I find all of it relevant. So in that sense, it is an objection because the court made a ruling. The court at least interpreted it as an objection and said, I find the discussion about Dr. Noor's life relevant to the case. Maybe I wouldn't go so far in some of the comments about the child, but I find it relevant and it's proper for the prosecutor to make this argument. But the court does have the transcript of that objection. It followed the very first opening statement and then the two other opening statements followed. With no objection? Yes. Particularly on the arguing facts, not in evidence. There's no objection in the record that the prosecutor ---- Was this the opening argument or the opening statement? The opening statement. At the beginning. At the very beginning. Apart from evidence of presence and flight, we have ballistics. We know that the gun ---- Wait, wait, wait. Was there a motion for mistrial at the end or ---- No. At the end of the evidence? No. No. If there was one, it wasn't on the grounds of prosecutorial misconduct. Right. Outside of evidence of flight, we have ballistics. We know the murder weapon is a 9-millimeter Glock. And Chen was seen carrying a gun that looked like a 9-millimeter Glock in the period immediately before the murders. We have evidence of motive. There was abundant evidence from several sources that petitioners regularly smoked raw cocaine in an effort to get the money they needed to buy the drug. They would commit chain snatches, not just in Chinatown, but in the very alley where Dr. Knorr was shot. Also, on the day of the murder, Chen and Lim talked to Tolmei about doing the robbery, and Chen said that he was armed. Then a few blocks later, a few hours later, Dr. Knorr was shot and his necklace was taken from him. Petitioners' false statements to the police connected them to the crimes. None of the petitioners mentioned to the police about being in the alley, getting a ride from Kroinger, or going to Tolmei's house. And finally, the defense case did not diminish the strength of the people's case. There was no alibi evidence. And although some of Dr. Knorr's neighbors testified that they heard or saw a car in the alley, none of them excluded petitioners as the assailants. And the defense case itself was weakened by the fact that, although these neighbors testified that they heard or saw a car, none of the petitioners told the police during their police interviews that, although they said they were in the alley, none of them said that they heard or saw a car. Prior to the time that this homicide occurred, Dr. Knorr was at the home of a friend? Yes. In Long Beach or someplace like that? Yes. How much time elapsed, as far as we know, from the time he left the house of his friend until the time of the homicide? The homicide, Sergeant Wiggins responded to the homicide at 8.49 p.m., and between 8 and 8.15 p.m. that same evening, Dr. Knorr had told his friend that he was going home. He got in his Mercedes, so he started to drive. And there was a photograph taken at the friend's house of Dr. Knorr. The photograph showed the gold Rolex watch. Yes. But the photograph apparently did not show the necklace. Yes. How do we know he was wearing the necklace, even though he was wearing the necklace at the time of the homicide? We have evidence of a habit and custom. His unofficially adopted daughter, Rama, testified that he wore it every day. His niece, Sophia Knorr, testified that she wore it every day. Is all of this testimony in the excerpt of record? It is not in the excerpt of record. It's in the factual summary portion of all three of the reports and recommendations. But we don't have it. We're going to get it, though. You will have it. Was there an objection to that testimony coming in about his sentimental attachment to this locket? No. No, there was not. No objection. Okay. Any further questions? No. Okay. Just to sum up, the state court's rejection of the prosecutorial misconduct claims was not an unreasonable application of controlling federal law, and the district court erred in granting extraordinary relief to the petitioners under the ADPA. Thank you. David Goodwin. Ms. Blair may request a minute or two at the end. Before I start, I don't think that the voir dire of the jury was in the record. I don't know. I know there were three juries, and I just do not remember that much voir dire being there. We can check. I don't know if the voir dire was there. That's all I can say. Have you read the record? I read the record, and I do not recall seeing the voir dire. Where? I read the entire record that started out with the court of appeal in the state court, and I don't know. Did you read the voir dire? I do not recall the voir dire being there. The voir dire is usually – You don't remember whether you read it or not. Correct. I don't think it was there. The voir dire is usually only included if there's a real bouts in motion, and I don't think there was. See, I think that would be relevant to determining whether there was a fair trial here. You may have – Do you disagree with me on that? I don't know if that's important, if I could get into that in a second. Because the thing is, I think the gist of the prosecutor's argument is the key, which I'd like to address. Well, I want to make sure in reading the voir dire that I'm not – If there were comments, it was before the inflammatory comments. If there were questions, did you hear about it? It was before the story about the baby. It was before the story about the finger being cut off. So, you know, what really came after is important. It might be – Well, but if the jury were told, and this is what routinely happens in a case with a celebrity victim. If the jury were told – Now, some of you may remember when you start hearing this case that Dr. Knorr had an interesting story. Whatever the story was, he was an Academy Award winner. Now, is anybody going to necessarily take that into consideration? That's usually what happens. If a lot of this information that was already in the prosecutor's statement was there and there was a promise by the jurors not to use that in an improper way, it may be relevant to whether this violated due process. If they went into the wife dying, then I could see – Let's jump ahead, though. The testimony then about his sentimental attachment, was that information in the testimony without objection? Well, actually, that's not quite true. At the time that Miss Rama, the niece, wanted to testify, the counsel, I think Miss Walensky for Mr. Lim, requested to approach and was told that she couldn't. So I think you have to assume that she wanted to make an objection. It would have been futile. But on top of that, it doesn't really matter because the problem is that the state court did not default her, did not default this issue. They addressed this issue. So I don't think it matters if there was an objection because the state court considered this issue, so we're not precluded from raising it. I'm not saying you're precluded from raising it, but the question is whether it was a due process. I think in due process, you want to look through the whole context of it. I think it's a smaller issue. Including whether there were objections, motions of strike? If I can sum up the entire context, and let me go anecdotal for 45 seconds, I think I can sum up this case and we can go to lunch. When I first started getting into this issue, I was talking to a friend of mine, another criminal appellate. You better stay near that little microphone. Oh, I'm sorry. Take it down. I'm sorry. When I first got into this case, I was talking to a friend of mine who's a criminal defense attorney, and I was telling her about the issue. And I was going on and on, as my wife will tell you I'm inclined to do. She doesn't have a 20-minute rule. And after going through the whole thing, my friend said, you're going to lose. And I said, why? And she said, I saw the movie. I cried. That's the problem with this case. There's some normal cases where every murder is emotional, every murder has victims, every murder has something else, but this case in particular is bringing in the seductive baggage, the stuff that's not relevant. I'm a little confused here about some stuff. Was there evidence that the defendants knew who he was? No. This is another aspect of the unreasonableness of the state court thing. Mr. Lim lived in the alley. They lived in the area. There was no evidence that they actually knew who he was. Lim's mother knew that he was an actor. Now, the state court, I think it was probably clear that the locket was underneath his shirt and it wasn't visible, so there was the question of how did they know about it, where the state court says, well, the mother knew that he was an actor and therefore they knew that he wore this locket. They're scraping the bottom of the barrel to find some basis for it. They may have known he was an actor. I don't know. There's nothing in the record. There's nothing in the record except the court's guesswork that he knew he wore the locket. Was the jury asked on voir dire if any jurors had seen the movie? I don't know because I do not remember seeing the voir dire. The movie was mentioned in opening statements. Whether there was an objection, I don't know if there was the magic talismanic word objection causing the duck to drop down. They were clearly requesting. You're portraying your age. I'm sorry. Don't show Mark's duck. Yeah. It's not on television for 40 years. They were asking that he not give that argument. They may not have said objection. They were saying, please do not have him argue this. And the court said, no. Actually, the court said, told him, I think you should leave out the part about the baby, which he went on and included anyway. There wasn't a formal, as I said, talismanic ruling. How long was this trial? The trial was, I don't remember. It was a fairly long trial because there were three juries so they had to split it up. It was a box load of cases. One box. The selection process, it must have gone on for months. The selection process. Actually, now I'm sure that the idea was not included in the record because I remember now seeing the gaps of, you know, gold jury, red jury, blue jury. There was nothing in between. So I'm pretty sure that was not included. So three juries were going at the same time. Yes. Interestingly enough, all three juries had the same problems reaching a conclusion. Two of them announced they were deadlocked. They both took a very long time. They both had questions in the same area. All of them were tied up in the same area. There's something that, pardon me? Which was? Well, it was the area of how much the two witnesses saw and how much was visible. It was a big issue at trial. You mean they have readbacks? Not only readbacks. There was a request to visit the scene. The defense originally requested to take the jury to the scene, the juries to the scene, and it was denied. Then one of the juries sends a note saying, we need to go to the scene. It's important. They said it's important. No, we're not going to do that. What was the scene? Okay. There's an alley that's about 900 feet long. The witnesses who had the car are coming out of a house at the bottom of the alley. Dr. Knorr's carport is about 900 yards up at the northern end of the alley. The witnesses at the bottom hear shots, and there was some question whether they were coming out of the walkway, whether they were in the car, but they hear shots. They get in their car. They look up the alley, and the three defendants are running down. So there's a question of what they could see. Yes. What city did this take place in? Los Angeles. I know that. Pardon me? Was this in Brentwood? No, Chinatown. Chinatown. Now, Mr. Lim lives halfway up the alley, so it's very important, because if he was running halfway down the alley, then he's running from home, and the inference... Was the alley flat? No, it goes up a hill. Where is it? It's between, I think, Alpine and Beaudry. You go up Beaudry. We can take a trip there if you want. It's between... And it goes up a long hill. So there's a question of how much they could have seen where the defendants were. And this is very important for a lot of things, because the question of flight is... The district court recognized that three gangbangers might run from gunshots just hearing gunfire. So if that's all it is, it's a very ambiguous piece of evidence. I think one of... Pardon me? I'm sitting here waiting for an argument about why this is not a reasonable interpretation. Okay, I was just about to get to that. There's a couple things that are very unreasonable at the application of state law, the state court. One thing that they did that's probably the worst is they just ignored the arguments that we made. If you look at the opening briefs, we very heavily stress the fictionalization of the struggle. There was no evidence of the chain being torn. There's no evidence of defensive wounds. There's no evidence... That was a very important part of our argument. Court of Appeals did not mention it. And that was to try to show there was no resistance? Well, we say there was no struggle. It was made up in order to create the... ...resistance to show the killing fields. If they don't have a struggle, then there's no reason to talk about the killing fields, which is the emotion. Don't they have to show resistance to suggest a robbery? If there's no... Well, no, the robbery could be with gunpoint, no resistance. Hold the gun, force, fear. You don't need the struggle for that. You don't need the... Wasn't your side arguing to the end that there was insufficient evidence of a robbery? We did argue insufficient... Not of a robbery. No, no. We were arguing insufficient that they were there. Initially, the trial court. That's not what we're arguing. And the Court of Appeals. We did not argue sufficiency of a robbery. That was never a dispute that Norah was killed or that the property was stolen. So the resistance... The struggle is important to show the resistance, which is why the killing fields are irrelevant. If they point the gun at him and he takes off the locket and gives it to him, then you don't have to talk about babies dying and wives dying and fingers being cut off. And all of that was in the opening? Yes. Now, the problem is, is that... So if you don't have the struggle, which we say is fictionalized, there's no defense of wounds. The witnesses, the two witnesses did not say... If you don't have the struggle, then you don't go anywhere else. The way the state court addressed the struggle, even after there was a major part of our brief, that's the core of the first part of our brief. State court doesn't address it. I think that's unreasonable. There's authority that if the state court does not address an issue at all, that's per se unreasonable. That's the first aspect of they're unreasonable. The second aspect is they completely take it out of context. What happened with... If you read, I think, on page 28 of the magistrate's report, he lists the places where Mr. Humm talks about the picture. The picture is the only thing that's left. The picture is what was more valuable than anything. It was the picture. He's talking about the only photograph, the photograph, the photograph, the photograph, and the photograph's contained in a locket. Now, it's not the only picture. That's a lie in itself. At closing, after talking about the importance of it, of the picture, the picture, the picture that's in the locket... Pardon me? Yes. And it appears that the one in the locket was the duplicate. But I can't say for sure. But that's what the implication is. But in closing, after making the whole thing about the picture, which is in the locket... Well, you know, it depends on what only means, not to get off on a tangent here. But if you have one picture of me, and you have 38 copies of it, it's still the only picture of me. Well, that... Was this the only picture of her, or was the other picture a different picture? Well, first... Okay. Only the picture in the locket may have been a duplicate. I think it was the same... I'm just trying to say that's the only picture. Okay. But the thing is, would he fight... The importance of him fighting is because it's the only thing left. If he has two of them, then why struggle? But that's not the unreasonable aspect. The unreasonable aspect is at the end, Mr. Humm mentions the locket. Well, the State court says... He never disputed that he always wore this. I think he wore it. He probably wore it. Did he always wear it? The picture, it did mean something to him. I'm not disputing that. But the way the court unreasonably addressed it... I'm trying to get to your question specifically, and then I'll get to the other aspect if you want. The court says Mr. Humm wasn't distorting it because Dr. Knorr was struggling for the locket, not the picture. I think this is an unreasonable application because it takes it completely out of context. He's struggling for the locket because it has the picture. The State court stressed the value of the gold locket, not the photograph. But the entire context... The jewelry... It wasn't... What? It's not jewelry? He gave up the Rolex. The reason... No, I meant a locket, something like that, has intense emotional value to people. It may have value. Emotional value. But it may have emotional value. The receptacle of something, the holder... Then the bottom line comes down to the question of, do you think, if they said, you can take the picture out, but give us the locket, do you think he was struggling for the gold or do you think he was struggling for what it contained? It makes sense to me that if you have worn something every day of your life since a certain event happened, and it contains something important to you, the fact that you had another copy of the picture someplace would still make that part of your identity important to you. It may have... I'm not denying that it had... I'm not saying it had no importance. But the fact of the matter is, is that you cannot divorce it. It's unreasonable to say it's the locket, which is what they did. And to say that they also... Why is it unreasonable? Would it be... I can replace my wedding band. I'm not sure that I wouldn't struggle if somebody were trying to take it off. The state court was trying to divorce it from the picture. It's not the picture. You can't say that. If you had a reading comprehension test, read... Do a reading comprehension test, old SAT style. Read the quotes of when he's talking about the picture, the locket, the picture, the picture. And then ask yourself, what's the important thing here? There's seven references to the picture. One reference... The reason the locket was important was because it carried the picture. Yeah. But then to say what the state court said was Mr. Humm wasn't arguing about the picture. You're divorcing it from the context. The entire context of what he was saying. It may be true that there's some gold value. But sentimental value to the locket. But you can't separate it. That's not... You can only separate it by taking it out of context. But we really don't know whether he put up a struggle for it. But that's the other fact, too. The fact that something's valuable doesn't necessarily... Even you're personally valuable. You don't know if something... People are shot before a struggle for no reason. I just don't follow your attempt to parse this into various aspects. I'm taking a look at this opinion again and it describes it as a special locket made for the only photograph, special necklace and locket. Only photograph? Well, it may have been the only photograph in a different thing. And you're saying they ignored the locket in the photograph and I don't see that. They describe it as one piece. I'm saying that if you look... Special locket made for the photograph, special necklace and locket. You're saying because they left out the photograph in that last sentence, they had it all confused? No, I'm saying that if you look at Mr. Humm's opening statements and you see the context of what he's talking about, he wasn't stressing the gold. He wasn't stressing the locket. The only reason it was the photograph, the photograph, the photograph, the photograph. Right, okay. Do you want to let... You used all my time. Did you want to... You want to keep... It's up to you. I'm fine. Thank you. I don't look too happy either. I love your freeway back and forth. Good morning. It's Janice Blair for Tax Sun Tan this morning. And I just want to respond briefly to the comment about the locket. The problem with the locket and the way the court of appeal was approaching this was that there was no evidence as to the manner of taking or the order of taking. There was just no witness at all to how the crime occurred. That's the problem in murder cases. Yes. Sometimes. So to piece the evidence together and come up with a rational explanation for why people who ordinarily snatch chains, in this case, would add homicide to the snatch of the chain. And that's another minor point that I do want to make as to Mr. Tan, because all the defendants were different in the sense that as to Mr. Tan, there was just one of these uncharged chain snatch prior, or chain snatches that evidence had come in, and not many others as the attorney general here described. But I think the situation here about the manner of taking it is that the prosecutor bootstrapped this theory. I mean, there was no evidence that he gave up the Rolex and fought over the locket. As the prosecutor argued, both in opening and closing statement, there was just nothing as to this at all. And there were other things of value there. I mean, there was no evidence at all as to what happened. And so that, I thought, was something that should be pointed out. I, too, do not remember reading the Vordaer. I mean, I read the transcripts in order to prepare the opening brief in the court of appeal, and I don't remember seeing the Vordaer. So that's another point. And if there are any other questions? No, because the Vordaer, my recollection is the Vordaer was never a part of the record on appeal, and so I don't the magistrate would not have had. Was it transcribed? I don't know. No. My understanding. My understanding is that it was not transcribed in the statute. That's my recollection, because I do not remember seeing it as part of the record on appeal. We'll find out. Thank you very much. Thank you. Just on the matter about the record and the Vordaer, remember that there is one volume before the opening statement. So we have a portion of the Vordaer. We probably do not have the entirety of the Vordaer. A portion of the record I was thinking about also was the opening statement in which the prosecutor says, some of us have said that we have heard of Dr. Noren. Some of you have seen his movie. Some of you know that he has won an Academy Award for his performance in that movie. So this is referring back to the Vordaer. I know, and that's why I want to read it. Right. I believe we only have a small part of it probably at this point. I thought you told us earlier the whole thing was. No. I said we have the entirety of the trial transcript, and we have one volume before the opening statement. And that's portions of the Vordaer, but it's likely that the entirety of the Vordaer was longer than one volume. So are you telling us that you don't want us to look at the Vordaer? No, I want you to look at it, but we don't. I don't believe we have it. Well, is it possible if it was. Let me understand. If it was not transcribed and made a part of the record on appeal at the state court, then is it possible to get it now? I don't know. Typically what happens in a regular appeal is that if the defense attorneys want to raise or want to look through the transcript of the Vordaer to perhaps raise a Wheeler issue, then they have that included or made a part of the record. That was never done in this case. Am I correct? The Vordaer is usually not transcribed? Yes, you are correct. Unless there's a specific request.  But you have the court reporter. The court reporter might have notes. It's probably not impossible to recreate it. If the court wanted us to, we would make our best efforts to do that. When was this trial? It was in 1998. So, yes, it probably should be around. The court reporter would probably like to transcribe the Vordaer. Three juries? Three juries. In terms of the comment about the one photo, it's true that the prosecutor's opening statement suggests that there was only one photo, but the jurors learned from the very first witness in the case that there were duplicates made of that single image of Dr. Noor's deceased wife when Dr. Noor was in the refugee camp in Thailand. And the prosecutor certainly ended the trial by emphasizing the loss of the locket itself. The state court's opinion suggests that the state court was well aware that the prosecutor made that statement one photo in the opening statements, but the court found that even if there were duplicates, it continued to be a reasonable inference from the evidence that the locket had great sentimental value to Dr. Noor. What did the evidence show us in the history of the locket? That when Dr. Noor escaped Cambodia and went to Thailand, he was first in a refugee camp where there were no beds, and then he went to another refugee camp in Bangkok where he left the refugee camp, went out, took that ID photo that he had of his wife. He had a negative made, and then from the negative he had duplicate photos made, and he had one touched up with color, and he took that one, purchased the locket and the necklace, and had this memorial forged for her. There was one photograph, although there may have been multiple copies. There was one image with multiple copies. How about the vouching question? That is not a part of the appeal. The district court found that there was no vouching, and that is not a part of the The court had asked a question about whether the defendants had contested that there was a robbery, and they had until the very end of the trial in this case. Basically, the first officer who arrived at the scene thought that the crime scene looked a little fishy because there was money left behind, traveler's checks, and a Mercedes, and the defense used that until the very end of the case to suggest that there was no robbery. So it was important for the people, obviously, to prove the crime of robbery. It's true that we have the use of a gun, but evidence of resistance by the victim also bolstered the people's case that there was force used and that a robbery was committed. There is no direct evidence, the court is correct, that Dr. Knorr resisted. What was the evidence that they took the Rolex watch from him? Because it was gone. A photo was taken of Dr. Knorr at between 8 and 8.15, so we know he had it. The argument that he didn't struggle over that is the reasonable inference from the fact that that did not have sentimental value to him, while we know that the locket did. They don't keep too good time, either. Well, we'll take we won't take judicial notice. And in terms of the locket being or the watch being the first item taken, that was also a reasonable inference from the evidence because the crime culminated in the gunfire, and afterwards there was flight and the leaving behind of several valuable pieces of property. But the Rolex watch was not left behind, so it must have been. Was the locket in evidence? No, it was never located. It was never located, so they didn't have the locket. No. And he wore it under his shirt. It was under the shirt. It was winter, it was cold, it was under the shirt, and it was long. And it was gone. And it was gone. Okay. Any further questions? No. Thank you. And we will supply the court with the entirety of the trial transcript that we currently have, and we will make our best efforts to locate the court recorders and see if we could get the voir dire transcribed for the court as well. Okay. Well, we will order the case submitted. We'll enter an order directing the state to file with the court. You want copies? Supplemental excerpts containing the entire transcript that is available, and also to give us a report within two weeks as to whether the voir dire can be made available. Don't order it yet. Just tell us whether it's there. Yeah. Just give us a bit of a report. We'll issue a formal order for that. Well, the court reporters would have to transcribe it. So in other words, the court wants to know if they have their original notes. If they have the notes and if it's feasible to do so. Okay. Yes. Thank you. Thank you. So the case just argued is submitted. That concludes the Court's calendar for this morning. The Court stands adjourned. All rise.
judges: Schroeder, Pregerson, Trott